Good morning, your honors. Kirk Hanson for the plaintiff and appellant, Anthony v. Nigro. Your honors, I think this case really presents a stark contrast between events that happened to Mr. Nigro prior to May of 2009 and events that happened afterwards. Mr. Nigro has a health condition known as ulcerative colitis and when it's in remission he can do his job without any accommodations. When the condition flares up, an accommodation that worked for him while he worked at Sears was coming in at a later start time. He had a 6 o'clock start time and when his condition flared up he lost sleep. So what his direct supervisor allowed him to do, that is Jason Foss, he let him come in at 9 o'clock in the morning. This worked well. In fact, prior to May of 2009, the accommodation at a later start time was successful on about 30 different occasions. Another accommodation he had prior to May of 2009 was a transfer. He was initially an outside maintenance technician and then he requested to be transferred to a store inside so he'd be close to a restroom. That worked fine. And when his condition became extremely flared up, that would be a point where he wasn't able to work. And in those couple instances where that happened, again his direct supervisor, Jason Foss, allowed him to take a leave of absence. Now, things changed beginning in May of 2009. What happened was Mr. Nigro came back from a leave on May 4, 2009 and he was fully recuperated. He was ready to go back to work. The difference was there was a new general manager at the Sears store, a gentleman named Larry Forrester. And what happened is when he came back from his leave on May 4, 2009, there was a problem with payroll. Mr. Nigro was working a full schedule, 40 hours or more in a week, but when he would get his paycheck, it would show the gross pay he earned, but it would zero out, so he would actually get no money. And his health benefits were also canceled. Do we know why that happened? Sears never, there's nothing in the record and Sears never provided any explanation as to why this happened. They do admit it was a mistake. This shouldn't have happened. You're not claiming that was some sort of retaliation or anything? Well, it doesn't appear to be. That appears to be some kind of computer error, something that went wrong. However, once it was brought to the attention of Sears, it was first brought to the attention of Jason Foss, who was Mr. Nigro's direct supervisor, and he's a good guy in this case, because at every turn he tried to help Mr. Nigro, and so he tried to fix the payroll problem. What happened though, because he wasn't getting paid, he couldn't buy his medications. He couldn't pay for food. He was getting evicted from his apartment. When you're stressed out, it causes colitis to exacerbate and to get worse. That's exactly what happened. So initially he went to Jason Foss and said, please fix my payroll and can I again come in at 9 o'clock instead of 6 o'clock, which had worked 30 times prior. Jason Foss had no problem with that, but he told him, things have changed now. I can't grant you an accommodation request. I have to bring it to the general manager, Larry Forrester, which is exactly what he did. When he did that, and this is the testimony of Jason Foss in the record, Larry Forrester told him, we're not going to do that anymore. We're not going to fix his pay and we are not going to let him come in at 9 o'clock. He has to be here every morning at 6 o'clock a.m. That message was relayed back to Mr. Nigro. Mr. Foss told him that Mr. Forrester didn't want to give him an accommodation, but he shouldn't worry about it because he, Mr. Foss, would give him the accommodation. There was another gentleman named Alan Kamasugi who was a facilities manager. Mr. Nigro also went to him and asked him for a later start time. His response was, don't bother because you're not going to be here any longer. That was his response. But I think when I read the brief from Sears, there was a statement in there that says, in May of 2009 and after that time, Sears offered Mr. Nigro an accommodation of a later 9 o'clock start time and he refused it. There is no evidence in the record supporting that statement. It's the opposite of that. In fact, there's a direct testimony from Jason Foss. His direct supervisor, Jason Foss, said, it's okay with me. But he said, I can't okay that request. I have to get permission from the general manager, Larry Forrester, for that. And so that's what he tried to do and he went to Larry Forrester. He said he couldn't let him do it. He said his hands were tied. He said because his boss, Larry Forrester, said, no, we're not going to do that anymore. We're not going to do that anymore. But that testimony from Mr. Foss' deposition, it's at pages 315 through 318 of the record. That's where he was deposed and that's where he explained he had no problem with the 9 o'clock accommodation. He wanted to give it but he couldn't. He said his hands were tied because the general manager, who was his boss, Larry Forrester, said, no way, we're not going to do that anymore. He has to come in at 6 o'clock a.m. period. So that request was denied. After May of 2009, during that time frame, Mr. Niagara also asked for an accommodation to transfer to a different job position, two different positions. One was tool lead and one was in merchandising. And both of those positions did not involve physical labor. Because physical labor made it more difficult for him and it made his condition worse. Both of those requests, first I believe went through Mr. Foss, but again Mr. Foss said I have to bring those requests to Mr. Forrester. And both of those requests were denied. Now, his condition finally got so bad that he couldn't work any longer. And at that point, that was I think around June 5, 2009, Mr. Niagara did go to Jason Foss and asked him if he could take a leave. Now what happened is Mr. Foss did approve that leave, even though he was told he had no authority to do that. He approved the leave and Mr. Niagara went out on leave. Several days later, Mr. Foss is transferred out of the store. And he testified that he thought that was retaliation because he had allowed Mr. Niagara to take leave. In fact, he said he got notice of his new job position at a store that would be much further away on a Friday afternoon where he was told he would be starting his new position that next Monday morning. And it was going to be in a store that was much further away. And he said he believed that was indirect punishment for him giving Mr. Niagara the leave in June of 2009. Now, in June of 2009, Mr. Niagara was on leave, which was approved by Foss, and he stays in contact with Sears. So it's not like he disappears. He's calling in routinely and explaining his condition is still bad. He makes multiple requests to have Sears fix his pay. And he says, if you can fix my pay and you let me come in for now at 9 o'clock in the morning, I can come back in to work. And all those requests were denied. He could come back to work in a month. Correct, yeah. That's right. And he had a telephone conversation with the general manager, Larry Forster, on June 29, 2009, where he told, again advised Mr. Forster why he was out, that he had an extreme flare-up of his colitis. He asked again during that telephone call if he could have a 9 o'clock start time, and he asked if he could have his pay restored. He said, if you can fix those problems, I can come back to work. And Mr. Forster's response was, if you're going to stick with being sick, it's not helping your situation. It is what it is. You're not getting paid, and you're not going to be accommodated. And that comes from pages 280 and 281 of the record. Counsel, Judge Gould, if I may just clarify a point. On the pay issue, was his pay later corrected, or are there pay claims in this case as well as disability determination? Yeah, there's not a wage claim in the case, but as far as I recall, the pay issue was never corrected. So you mean he worked a number of days for which he got no pay, is that what you're... That's correct. And I believe it was Sears' position that they had somehow improperly given him advances prior to that, and that the advances they gave him canceled out the pay that was owed to him. I believe that was Sears' position. But there is no pay claim in the case. Those issues aren't really before us, right? That's correct, Your Honor. That's correct. Okay, thank you. Now, there is a report in the record that was also in front of the district judge. It's a July 2, 2009 doctor's progress report from Dr. Murad, who was Mr. Niagara's doctor. In that report, he acknowledges he can't figure out either why Mr. Niagara is not getting paid, and he opines that... The doctor can't figure out why... Yeah, the doctor in his report said the same thing. Because Mr. Niagara actually brought Dr. Murad his pay stubs, where it showed the hours he worked, and it showed when he got down to the bottom line item, he was getting paid zero. And so the doctor in his progress notes even says, I can't figure it out. He can't explain it to me. But what he does say is that because he's not getting paid, he can't buy his medications. He was also seeing, I believe, either a psychologist or a psychiatrist. He had to stop going to those sessions. He couldn't buy food. This stress, in conjunction with not having his medications, caused his condition to continue to be extremely flared up. And so Mr. Niagara was essentially absent from June 5th until he was terminated in the first part of August 2009 because of his colitis. And the reason his colitis was so flared up was because Sears had a mistake on his payroll, which then caused him to lose pay, and they also refused to accommodate him in any way. And so it was actually Sears' refusal to accommodate him that caused his colitis to continue to be in extreme condition all the way through May, June, and through July. I have a couple of questions about July. Two things happened in July that I think are important in our decision in this case. On July 28th, Mr. Niagara sent an email requesting that he be terminated. This was before the actual termination, correct? That's right. That's correct. How do you explain that? I mean, if he requested to be terminated, how can he then claim that Sears terminated him? Well, this is what happened. Remember, he had no money. He couldn't pay for his medications, for his food. The only way he could access money was to cash out his 401K. And the company had said they were going to terminate him, but they hadn't actually provided him the paperwork yet. So until he actually had something from the company that said, you're terminated, he was told by whoever handled that issue that he wouldn't be able to cash out his 401K for money. So that's what happened there. He didn't want to be terminated. That was not his desire. Are you claiming constructive termination of some sort? I think that would amount to that. Correct, yes. Because all the way up until that point, he kept telling Sears, I want to come back. I need some accommodations, though. Fix my pay. Let me come in at 9 o'clock. But that went nowhere. For almost three months or two months, that went nowhere. Finally, I think he just gave up. But yes, that would be a constructive termination on that point because he had no money. He was forced to terminate him. He was forced. He had no other way to get money except to cash out his 401K, which he couldn't do unless he was officially terminated. The other thing that happened in July is that he was asked to provide some documentation, and I think there's a contested fact about whether the HR person, Miss Petty, was it? Genevieve Petty, that's correct. Allowed him to not provide the documents. I know there's a contested fact about that. But he says he did drop off the documents, but he didn't give it to Forrester personally. Were those documents complete? Yes, there were several documents. One of them was actual medical certification saying, again, he has ulcerative colitis and needs to be off of work. I believe that was signed by Dr. Murat, I believe. He also included his own little memo explaining, basically, why are you doing this to me? My pay has been cut. You won't restore it. You won't accommodate me. So that was included in the same package. And you're correct, there is a disputed fact there. I believe Sears is claiming they never received it. Mr. Nagro was adamant about the fact that he walked it into the office and put it in the box for Genevieve Petty, who's the HR person. There was another witness. She was away at the time. She was away on a vacation at the time, correct. But, again, that's a disputed fact. We're here on a summary judgment motion, so that's the kind of issue that a jury needs to decide who's telling the truth on that. If there's any other questions from yours, I think my time is just about up here. Well, I have one question, but you've told me it's not really before us. Well, maybe Judge Reinhart would give you a couple of minutes for rebuttal, even though your time's up. And in the course of that, if there's a way in 30 seconds, you can explain to me why there's no claim for money here. That would help me understand the circumstance for wages. Yeah, I think there is. I think it's not in front of this Court. It's not in this case. But even if an employer wrongfully takes wages, they can't, in California, can't engage in self-help remedies. In other words, they zeroed out his paycheck because I think they believe they had overpaid him at some point. But that's illegal in California. You can't do that. You have to either get an agreement with the employee or you have to file a lawsuit to settle that matter. So are you claiming that the failure to restore the pay that he'd continually been requesting was an accommodation? Or that if they had done that, that is part of the accommodation he was seeking? I think that would be part of the accommodation. But I think that would be part of the accommodation request in addition to the others. But I think also, at some point, it becomes evidence of discriminatory animus on the part of Sears. Because, okay, maybe it started out as a mistake, but then when you refuse to fix the mistake, then I think there's ill will there. And I think that developed over the period of months. Thank you. All right. Thank you, Your Honor. Good morning. May it please the Court. My name is Anne Marie Wagoner, and I represent the appellee Sears Roebuck & Company. On the issue about the pay, before I address the comments I had intended to make to the Court this morning, I did want to address that issue. There is no pay claim in this case. There is no allegation that anything was done to Mr. Nigro or that there was any fiddling with his pay or wrongful denial of his benefits. The issues with Mr. Nigro's pay were resolved in 2010. They're not part of the case at all. I was frantically... They're not part of the case, and they may have been resolved, but counsel saying that that was one of the reasons that Mr. Nigro said, all right, terminate me, that it was fair to make the payments, was one of the causes of his sending that letter. That plus the previous letters he had gotten, which said you're going to be terminated if you don't do something, and then he never heard anything after he did it. But part of his argument is that the reason that he did send the termination letter was that he was not getting paid. He is certainly arguing that one of the reasons he asked to be terminated and to receive his 401K is because he was not being paid. But what he is not arguing and what today I heard for the very first time is that there's some kind of claim that there was an issue with his pay or some issue with his benefits, and that had to do with him being disabled and that was discriminatory or retaliatory or a failure to accommodate. That has never been part of the case. There was an issue with his pay, and it had to do with when he went on a leave in January of 2009 and there was some kind of error that was made in the system. And then when he came back, there was money that was being withheld from his paycheck. So there certainly was an issue with his pay, but for purposes of the legal claims in this case, that's never been part of this case. The legal claim, as I understand it, is that Mr. Forrest has said to him, you know, if you continue this sick business, you're not going to get any pay, you're not going to get pay, you're not going to get accommodations, so shape up. What Mr. Forrester allegedly said to Mr. Nigro, as Mr. Nigro testified to, was if you're going to stick with being sick, it's not helping your situation, and you're not going to be accommodated. That is the alleged statement. That statement supposedly happened during a telephone conversation when Mr. Nigro was already on a leave of absence on June 29, 2009. And assuming that statement occurred, and I understand there's a dispute about that, it doesn't create a material, genuine, factual dispute for trial because Mr. Nigro continued to be accommodated after that alleged conversation. What was the date of the conversation? June 29, 2009, and Mr. Nigro was already on a leave of absence at this point. He was on a leave of absence starting June 5, 2009, and he remained on a leave of absence until August 5, 2009, which was when he was terminated for job abandonment at his request. But isn't that evidence of a lack of commitment to accommodate him in the future? And there's more than that. There's also a statement by a general manager named Adams that the district court found was hearsay. Do you know what I'm talking about? I'm looking at pages 8 and 9 of the district court opinion where he says Nigro stated that Jason Foss testified that this district manager said, I'm done with that guy. Isn't that admissible? I think it is hearsay, but even if Isn't it a party admission? This is a district manager making that statement, I'm done with this guy? Even if he had said, I'm done with this guy, and I think it's Mr. Nigro that says that Mr. Foss told him that Mr. Adams said that. So it's hearsay within hearsay, but they're both at party admission, so why wouldn't they be admissible? The district court found they were inadmissible hearsay. That's error, don't you think? Well, if it's an erroneous evidentiary ruling, I think that it doesn't have any effect on whether or not there's a genuine issue of material fact. So Adams says, I'm done with that guy. Well, the fact remains is that Mr. Nigro was on a leave of absence. He wasn't on a company-approved leave of absence because he didn't follow the procedure. But nevertheless, the company allowed him to remain off of work. There was another conversation on June 29th where he alleges that Mr. Forster supposedly said what he said, and then he continued to be accommodated with another leave of absence. And then on July 23rd, the company sent him a letter and said, we need to know what your status is by July 25th. You need to come in. You need to talk to Larry Forster. And what did Mr. Nigro do? He came to the store. Mr. Forster was there in the store, and he dropped off a doctor's note dated June 12th that was taking him off of work from June 5th through June 20th and also some disability paperwork that he had filled out with the EDD, taking him off work through, I believe it was early September. And he knew that Ms. Petty was on vacation when he dropped the paperwork off. He didn't talk to Mr. Forster. And the very next thing that Mr. Nigro does is he calls up the district manager, and he doesn't tell the district manager, or I'm sorry, he emails the district manager, and he doesn't say anything to the district manager about somebody's not accommodating me, hey, something's not fair, I can't work, I'm sick, I need a transfer. There's nothing like that. He says, hey, I got a letter that said I'm going to be terminated, and therefore we need to be terminated because I'm still showing as active in the system and I can't get my 401K. And then he was terminated. Do you have a copy of the July 23rd letter there with you? I don't have a copy of it with me. I can give a record site, or if the court please, I can pull it out of my binder, but it's not up at the podium with me. The July 23rd letter is page 699 of the record. Would the court like me to find it and hand it up? Please, I'll give you a minute extra if you take your time. Thank you, Your Honor. Counsel, it does have my highlights on it. May I approach? No, just tell me what does it say. Oh, yes. It says, Dear Anthony Nigro, Our records indicate that you were scheduled to work from 6-8-2009 to 6-9-2009. You have not reported for your schedule, typo, shifts. We have not heard from you since 6-29-2009. You were scheduled to bring in your doctor's note for your unexcused absences by 7-1-2009. You failed to do so. Please contact Larry Forster within two days of the date of this letter to discuss the situation. Failure to contact us within two days of the date of this letter will result in termination of your employment for job abandonment effective 7-25-09. Respectfully, Larry Forster, store manager. And then what did he do the next day? Did he bring something in? He came in on the 24th, I believe, to the store, and Forster was working. Petty, he knew, was on vacation. And Mr. Nigro brought in a letter from his doctor dated June 12, 2009, saying that he needed to be out on a leave until June 20th. And then also a one-page disability form that his doctor had completed for the EDD so he could get disability benefits. And the disability form, the site to the record on that is 372. And it says that he can't work because he's not able to afford to pay for his medications. And there's no communication whatsoever between Mr. Nigro and Sears until Mr. Nigro contacted Mr. Adams. At that point, he's been told, we're done with you. We're not going to accommodate you. And he's given up because he's got no choice because he's not getting paid. What more could he do? He's sick. He's really calling in sick. And I'm just not sure what else he could do. Well, Your Honor, he's not calling in sick because he called out sick, I guess, after the conversation with Mr. Forster on June 29th. But he's remained out. There's been no communication from anyone at Sears saying, you're fired, you can't come back, you're not welcome here. And so then he gets this letter, and he gives the response which he gave. He could have certainly gone to Mr. Adams, which he did, and brought forward any concerns about unfair treatment, but he never did that. And he was being accommodated. Even if Mr. Forster said what he said, he was being accommodated. Don't you think a reasonable jury could find otherwise? I don't think so, Your Honor, because that's why we have summary judgment. The issue is whether there's a failure to accommodate, and he was accommodated. With respect to the later start time, there was an argument that Mr. Foss told him, Larry Forster said that you can't come in late anymore and my hands are tied. Well, actually, what Mr. Nigro testified on that point is in the record at pages 531 and 532. So he was asked, at some point in time, did Mr. Foss tell you you could no longer come in late if you were having a flare-up? No, he didn't. Did Mr. Foss ever tell you that you couldn't come in later now if you were having a flare-up? No, he didn't tell me that. He told me what Larry, meaning Larry Forster, said. But did Larry tell you not to worry about it, you could still come in late if you needed to? Larry, excuse me, Jason Foss. Yes, Jason told me I'm going to continue to accommodate you. This is what Larry said. This is what I'm saying. Also, Mr. Nigro testified that he did not need the later start time in May of 2009. At page 533, he was asked, but Jason told you you could still come in late if you needed to? Jason continued to accommodate me. Right, so was there ever a time that you needed to come in late on a day you actually worked that you weren't allowed to come in late? I can't think of one offhand right now. He was never forced to come in at 6 o'clock. In fact, his boss, Jason Foss, told him he could come in at a later time if he needed to, and Mr. Nigro admitted at his deposition that, in fact, he didn't need to. There was also a reference to Allen Kamasugi, the district facilities manager, allegedly saying that Mr. Nigro would not be allowed to come in later. That is inaccurate. In fact, the testimony at pages 609 through 610 of the record is that when Mr. Nigro mentioned the late start time to Mr. Kamasugi, Mr. Kamasugi said, sure, that's fine with me. With respect to the alleged request for a transfer, there's no testimony from Mr. Foss that Mr. Nigro ever requested of him that there be a transfer. The testimony about Larry Forster supposedly refusing a transfer request, that is Mr. Nigro saying that Foss told him that Forster said that. In fact, Mr. Nigro met with Larry Forster on May 22nd of 2009, and they talked about a lot of things during that meeting, a lot of it having to do with his pay. But never once during that meeting did Mr. Nigro say, hey, Larry, I need to transfer. I'm sick. I'm not doing well. I can't come in later. There was none of that. And the record sites to that are 566, 567, 628 through 629, which is actually a written statement that Mr. Nigro wrote up after that meeting, and then 697, which is an email that Mr. Forster wrote to himself documenting the conversation. There's also no other evidence that Mr. Nigro, well, he did ask Ms. Petty, he said, I need a later start time or a transfer. And she referred him to Mr. Foss. He was provided the later start time. He was accommodated in his existing position, and it turned out that he didn't need it. The transfer requests were all because he didn't want to be in the store anymore. There was some kind of issue going on where another employee had raised a concern about Mr. Nigro being seen with a former employee. There were a bunch of things swirling around. But the transfer request didn't have anything to do with needing the transfer because of any sort of condition that he suffered from. He emailed Gary Clemens about a transfer. He was the regional facilities manager. He never mentioned his medical condition. That's pages 560, 568 through 570. He emailed Chris Adams. Again, nothing about a transfer. Chris Adams was the district manager. That's pages 563, 627, and 630. If the court has no further questions, I would submit. Let me ask you one. Counsel, let me ask one question, please. At some point, appellant's counsel said that Mr. Nigro came back to work after having been out and that Mr. Foss liked to accommodate you, but I can no longer do it without approval of Mr. Forster and that Mr. Forster didn't approve the accommodation. Is there testimony that Nigro said that? There is testimony that Nigro testified that Mr. Foss, who was his immediate boss, told him that Mr. Forster said, I'm not going to allow you to have a later start time anymore. But then there's also testimony from Mr. Nigro at page 532 of the record that Jason told him, and I'm paraphrasing, Jason told him, this is what Larry said, but this is what I'm going to do. I'm going to continue to have a later start time. And then later on, Mr. Nigro testified at his deposition that there was never a time that he needed a later start time, that he couldn't have it. Well, after that he didn't work, did he? He did, Your Honor. He didn't work after that. He did. So he came back on May 4th and was cleared to return to work with no restrictions. The record's not clear exactly at what point in time the later start time issue came up. I've always assumed it was in May because he went out on leave again on June 5th. But it's unclear when that issue came up. The issue with his pay and benefits came up when he got his first paycheck, which would have been on May 22nd. And that's page 199 of the record. Thank you. Thank you, Your Honor. Thank you very much. Let me just ask you this. There was a phone conversation in June in which Mr. Nigro says that Forster told him, if you're going to stick with being sick, it's not helping your situation. It is what it is. You're not getting paid, and you're not going to be accommodated. Now, the district court said the source of this evidence is Nigro's own self-serving testimony, and the intent described to these statements by Nigro is speculative. I don't understand the self-serving part. Of course, if you testify, you testify to the facts you think are facts that help you. I don't understand why self-serving disqualifies testimony. And the intent ascribed to these statements is speculative. Well, if the statements are, if you're going to stick with being sick, and this is the quote from the district court decision, if you're going to stick with being sick, it's not helping your situation. It is what it is. You're not getting paid, and you're not going to be accommodated. What's speculative about the intent? What's speculative is what would have happened had Mr. Nigro emailed and said, terminate me so I can get my 401K. Because what we do know for sure is after this conversation, Sears allowed Mr. Nigro to stay out on a leave of absence for another month. So we know that, and that's an accommodation. And that was an unpaid leave of absence? I believe it was unpaid. He had exhausted his seminal leave. But he could not work at this time. I mean, it's not like Sears told him, Mr. Nigro, you have to take a leave of absence. We know you want some other accommodation, but you have to take a leave. Mr. Nigro needed that leave of absence because he could not work anymore. Tell me why this does not create a genuine issue of fact over whether when he could work he would be accommodated. Because there was a letter sent, that was the June 23rd letter, saying you need to come in to discuss the situation. And he came in. He didn't discuss the situation with Mr. Forster. He didn't make any attempt to discuss it with Mr. Adams, Mr. Forster's boss, a couple of days later. I think that may be July or something. Did I say June? I'm sorry, Your Honor. The letter was dated July 23rd, 2009. I apologize for that. In June, the end of June, he says that Forster told him, you're not going to get accommodated if you stick with his sick business. And why doesn't that create a genuine issue of fact? Because he was accommodated, if that statement was made. By letting him stay on unpaid sick leave? Well, yes, that was exactly the accommodation that Mr. Nigro had requested. When he came back, he wanted to be able to start at 9 when he needed to. That was the accommodation he had been given in the past. But then he has a doctor's note that he presents on July 24th, or I'm sorry, not a doctor's note, but the disability claim form, saying he's got to be out until early September. So now there's no talk of coming back at the end of July. And there's no interaction between Mr. Nigro and Mr. Forster or Mr. Adams or Ms. Petty or anyone else at Sears to discuss the situation. The only thing there is is Mr. Nigro emailing Mr. Adams asking to be terminated so that he can get his 401K. And that's where it all breaks down. Even if Mr. Forster said that, it's speculation what it all might have meant because he was accommodated for another month with the accommodation that he requested. Well, here we have somebody with a chronic illness who's going to have this happen from time to time probably forever. And he's been told, as long as you're sick, we're not going to accommodate you. Even if they did accommodate him on one occasion, he's basically being told he's not going to be accommodated in the future and he knows he's going to have to make these requests in the future. Isn't that enough to go to a jury? It's not because he was accommodated and because we don't know what would have happened in the future. But he wasn't accommodated in the sense of being allowed to come in at 9 instead of 6, which was the basic accommodation. You're saying he was accommodated because he was allowed to remain on sick leave. He did not ask to come back on June 29th on a later start time. He said, I think I can come back on July 25th if I have a later start time. And so then Mr. Forster allegedly said what he said. And then when Sears reaches out to Mr. Nigro and says contact us to discuss the situation, he doesn't try to talk to Mr. Forster, he doesn't try to talk to anybody else, and all he does is request to be terminated. So Mr. Nigro is the one that cuts it off. It's speculative because we don't know. I have a question on that. After Forster sent the letter, which I think you read earlier, and said come talk to me, then at the end of the letter, though, it said instead of getting information to me, I think you read that it said to us. Am I right? It sounded like the last clause that you referenced was a request to get information to us. I thought that after that, he gives a packet of information, tries to give a packet to the HR person. So do I have the facts wrong on that? No, you don't. The last paragraph of the letter first says please contact Larry Forster, and then it says failure to give the information to us will result in your termination. So he did give information, but what he didn't do was engage in any type of interactive process other than contacting Mr. Adams and saying I got a letter saying I'm going to be fired and I'm showing up as still active and I need to be terminated to get my 401K. Okay, thank you. Thank you. Thank you, Catherine. Thank you. Your Honor, I wasn't sure if I was going to have any additional time for rebuttal. You have a minute and 18 seconds. Thank you. Thank you. Very briefly, Sears keeps saying that we did the ultimate accommodation at the end in letting Mr. Niagara stay out on a leave for May and June and through July of 2009. That really wasn't an accommodation because they knew if he wasn't getting paid, he couldn't buy his medications, they knew he wasn't going to get any better. All they were really trying to do there was have him quote-unquote die on the vine so he would eventually self-terminate himself, which is eventually what happened. If that's it? I think, well, there's one point I want to raise. Sears was talking about there was contacts with Mr. Niagara at the end and Mr. Niagara failed to engage and start the interactive process, but that's not the law, especially under the Humphrey case. It says if the employer knows the employee has a problem, has a serious health condition, it's the employer's duty then to engage in the interactive process, to initiate the process. And Mr. Niagara, at no time did he hide his medical condition. Remember in the June 29, 2009 teleconference with Mr. Forster, he told him again, I'm still suffering from colitis, I need some accommodation, fix my pay, let me come in at 9 o'clock and I can come back to work as soon as I can. Right there, Sears had a duty to engage in the interactive process and talk to him about whether they were going to agree to that accommodation or not or whether there was alternative accommodations. Remember, after May of 2009, every time Mr. Niagara asked for an accommodation, the answer was no, and that was it. It ended there, and there was no other discussion about it. Thank you, counsel. All right, thank you, your honors.
judges: Gettleman, Reinhardt, Gould